1  Richard D. McCune (State Bar No. 132124)
   rdm@mccunewright.com
2  David C. Wright (State Bar No. 177468)
   dcw@mccunewright.com
3  **McCUNE WRIGHT AREVALO, LLP**
   3281 E. Guasti Road, Suite 100
4  Ontario, California 91761
   Telephone:  (909) 557-1250
5  Facsimile: (909) 557 1275

6  Emily J. Kirk (IL Bar No. 6275282)*
   ejk@mccunewright.com
7  **McCUNE WRIGHT AREVALO, LLP**
   231 N. Main Street, Suite 20
8  Edwardsville, IL 62025
   Telephone: (618) 307-6116
9  Facsimile: (618) 307-6161

10  *Pro Hac Vice* application to be submitted

11  Attorneys for Plaintiff Jennifer Dupre
    Gutierrez and the Putative Class
12

13

14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16  JENNIFER DUPRE GUTIERREZ         Case No. 2:21-cv-6779
    individually, and on behalf of all others
17  similarly situated,

18              Plaintiff,            **COMPLAINT FOR:**

19  v.                               1. Violation of the Electronic Fund
                                         Transfer Act (Regulation E, 12
20  FIRST ENTERTAINMENT CREDIT          C.F.R. §§ 1005, *et seq.*)
    UNION, and DOES 1 through 5,
21  inclusive,                       2. Violation of the California Unfair
                                         Competition Law Cal. Civ. Code
22              Defendants.              §§ 17200, *et seq.*)

23                                   **CLASS ACTION**

24                                   **DEMAND FOR JURY TRIAL**

25

26

27

28

Class Action Complaint
Case No. 2:21-cv-6779

**CLASS ACTION COMPLAINT**

1.      Plaintiff Jennifer Dupre Gutierrez hereby brings this lawsuit against First Entertainment Credit Union ("FECU") on behalf of FECU's members, on the basis that FECU has violated Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.* Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; and (3) obtain verifiable affirmative consent of a customer's agreement to opt into the financial institution's overdraft program.

2.      In order to comply with Regulation E, FECU must provide members with a Regulation E opt-in disclosure agreement that accurately and simply describes its overdraft program and services. But FECU does not provide its members, including Plaintiff, with an accurate and/or easily understandable Regulation E opt-in disclosure agreement describing the circumstances or conditions in which FECU charges overdraft fees.

3.      Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent from customers through an accurate disclosure of their overdraft practices in a stand-alone opt-in disclosure agreement, FECU's assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal. Further, FECU's continued use of a non-conforming disclosure agreement to "opt-in" new members to its overdraft service is invalid.

4.      Regulation E provides a cause of action against financial institutions that fail to abide by its requirements. FECU's violations are also actionable under the California Unfair Competition Law ("UCL"). *See* Cal. Civ. Code § 17200 *et seq*. Pursuant to the UCL, Plaintiff seeks to enjoin FECU from continuing to obtain new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement that violates

-1-

Regulation E, and from continuing to assess overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E-compliant disclosure agreement. *See* Cal Bus. & Prof. Code § 17200 *et seq*.

## I        NATURE OF THE ACTION

5.      All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel (unless otherwise stated). Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

6.      Plaintiff has brought this class and representative action to assert claims in his own right and as the class representative of all other persons similarly situated. Regulation E requires FECU to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm caused by large overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all mandated overdraft information in one clear and easily understood document. Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with account holders regarding the institution's overdraft policies.

7.      FECU does not meet these requirements. It does not provide its members with a compliant stand-alone Regulation E opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe its overdraft services including, but not limited to, failing to state or clearly describe its overdraft

procedures within the four corners of the opt-in agreement. It also fails to include all of the information mandated by Regulation E, and includes additional information not permitted. Furthermore, the opt-in disclosure agreement uses inconsistent terminology to describe FECU's overdraft services and misrepresents and/or promotes the overdrafts services in a misleading manner.

8.     In its opt-in disclosure agreement, FECU explains that it will pay overdrafts for those members that opt into its overdraft program ("Overdraft Protection") and do "not have enough money in [his or her] account to cover a transaction." When the overdraft is covered, FECU charges the member a $27 fee.[1] But FECU's opt-in disclosure agreement inaccurately discloses what it means for a member to "not have enough money" in the account. Regulation E requires FECU to clearly and unambiguously disclose how it calculates overdrafts, and under what conditions it charges overdraft fees as part of its overdraft program.

9.     FECU's failure to accurately present all of the required information about its overdraft services, and its use of inconsistent terms to describe its overdraft service, all show fundamental disregard for Regulation E's basic purpose of protecting consumers by ensuring that all of their overdraft service options are disclosed so they can make an informed decision when deciding whether or not to opt into overdraft coverage for Regulation E-covered transactions.

10.     Plaintiff has been harmed by FECU's violations of these regulations. On information and belief, Plaintiff was opted in to FECU's overdraft program using an improper disclosure agreement that failed to adequately describe, and misrepresented to members, FECU's overdraft practices. Further, Plaintiff has been assessed overdraft fees on transactions that were not permitted because FECU obtained Plaintiff's "consent" using the non-compliant agreement. This action seeks statutory damages, restitution, and injunctive relief resulting from, *inter alia*, FECU's policy and practice of obtaining

---

[1] https://www.firstent.org/banking/overdraft-protection-program (last visited Aug. 20, 2021).

-3-

"affirmative consent" using a noncompliant opt-in disclosure agreement while improperly advertising and marketing its overdraft services.

## II    PARTIES

11.    Plaintiff Jennifer Dupre Gutierrez is a resident and citizen of Los Angeles County, California, and a FECU member at all relevant times to this Complaint.

12.    Based on information and belief, FECU is a credit union with its headquarters and principal place of business in Los Angeles, California. FECU maintains several branches throughout Southern California.

13.    Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

14.    Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

15.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

16.    At all material times herein, each Defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other Defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

17.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

18.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

### III     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff or class member and one defendant are citizens of different States. In addition, this Court also has federal question subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m, and has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District because FECU maintains its headquarters in this District, transacts business in this District, and FECU executed the unlawful policies and practices which are the subject of this action in this District.

### IV     BACKGROUND

**A.     Defendant FECU**

21.     FECU is a credit union headquartered in Los Angeles, California, with branches in several cities across Southern California. As of December 31, 2020, according to its financial filings, it reported having over 89,000 members and holding nearly $1.9 billion in assets. FECU reported that in 2020 it collected approximately $12.25 million in fee income, of which overdraft fees are believed to constitute a significant percentage.

Class Action Complaint
Case No.

22.     One of FECU's main services is a "share deposit" account.[2] A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines. Debits decreasing the amount in a checking account also can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

### 1.     Assessment of Overdraft Fees

23.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), FECU assesses overdraft fees (a fee for paying an overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

24.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation. The fee FECU charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[3]

---

[2] This is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

[3] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Aug. 20, 2021).

-6-

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added.)[4]

25.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[5]

26.    FECU's financial filings and practices reveal that it has followed these trends to the letter. FECU charges an overdraft fee of $35 per item. But even if it had been properly charging overdraft fees, the $35 overdraft fee bears no relation to its minute risk of loss or cost for administering overdraft and non-sufficient funds services. But an overdraft fee's practical effect is to charge those who pay them an interest rate with an APR in the thousands.

---

[4] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Aug. 20, 2021).

[5] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Aug. 20, 2021).

Class Action Complaint
Case No.

27.    Accordingly, overdraft fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[6] In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[7] More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

28.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees. (*Id*. at p. 3.) A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id*.) More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4.) And non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3.)

**B.    Regulation E**

29.    For many years, banks and credit unions have offered overdraft services to their account holders. Historically, the fees these services generated were relatively low, particularly when methods of payment were limited to cash, check, and credit card. But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial

---

[6] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Aug. 20, 2021).

[7] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Aug. 20, 2021).

institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

30.    As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small. As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

31.    Using common understanding, an overdraft occurs when two conditions are satisfied. First, the consumer initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall. An overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the accountholder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[8] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

32.    Before the Federal Reserve amended Regulation E regarding requirements for overdraft services, many financial institutions unilaterally adopted internal "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while

---

[8] For a thorough description of the mechanics of an "overdraft," *see* https://www.investopedia.com/terms/o/overdraft.asp (last visited Aug. 20, 2021).

-9-

charging the standard overdraft fee. Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning a $4 cup of coffee at Starbucks into a $40 cup of coffee.

33. The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs. Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all. It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions. After Regulation E's amendment, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee, or direct the transaction to be denied at the point of sale. Further, without the opt-in, the financial institution could not charge an NSF fee because denying an ATM withdrawal or one-time debit card purchase meant no transaction had ever taken place, and thus there was no transaction to return.

34. After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to account holders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB further

-10-

estimated that the banking industry may have collected anywhere from \$12.6 to \$32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[9]

35.     Given the state of overdraft programs prior to Regulation E's amendment, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average of \$24) for a small period of time (average of 3 days), then charge a large fee (average of \$34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in an APR of thousands of percent interest (using averages—17,000% APR), all while assuming very little risk because only a very small percentage of overdraft customers fail to repay an overdraft.

36.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document, segregated from other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the account holder the institution's overdraft charge policies. The account holder's choices must be presented in a "clear and readily understandable

---

[9] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

Class Action Complaint
Case No.

manner." 12 C.F.R. § 1005.4(a)(1). The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

37.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

38.     But financial institutions did not stop with charging these exorbitant penalty fees. Instead, many of them began manipulating the process as to when they would consider a transaction an overdraft, because the more overdrafts they could create, the more their profits would increase. To that end, they charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but extended overdraft fees to transactions paid with their customers' own money. That is, a financial institution would unilaterally decide the account was overdrawn not because an account lacked funds, but based on an artificial calculation involving the money in the account minus holds the financial institution unilaterally reserved for future payment at some future date.

39.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account. "Actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time. In contrast, "available balance" is a term of art the financial industry uses to describe the balance reduced from

the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[10] But absent further explanation introducing these concepts to consumers, terms like "available balance" have little or no meaning to reasonable consumers.

40.     Although financial institutions calculate the two balances, the actual/ledger/current balance of the money in the account is the official balance. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

41.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual account balance or the "available balance" for overdraft and NSF assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or some other artificial balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

42.     Many financial institutions use the "available balance" for overdraft assessment purposes as it consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account. On the other hand, the available balance always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank

---

[10] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

-13-

Class Action Complaint
Case No.

or credit union uses to categorize some of the money. All of the accountholder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

43.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

44.     A hypothetical demonstrates what the financial institution does under these circumstances. Suppose that an individual has $1,000. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

45.     The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual

Class Action Complaint
Case No.

put the $1,000 in his checking account under similar circumstances on the 27th of the month. That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee. He approves the water bill payment, and it posts immediately. Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account. All three payments are made with the individual's own account funds. The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive. However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

46.    A financial institution using the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance,

although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

47.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.,* the actual, ledger, or current balance) to calculate overdrafts *without clear disclosure of that practice* likely violates Reg E and other state laws. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[11]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[12]

---

[11] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Aug. 20, 2021).
[12] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Aug. 20, 2021).

-16-

48.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated and explained in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately or ambiguously describing the use of which balance a financial institution uses as part of its overdraft practice violates the plain language of Regulation E.

### 1.     FECU's Regulation E Practices

49.     FECU opts members into its overdraft program using an opt-in disclosure agreement that violates Regulation E. The opt-in disclosure agreement is inaccurate and/or unclear because, *inter alia*, it does not inform Plaintiff and putative class members about FECU's method of assessing overdraft fees.

50.     In its opt-in disclosure agreement, FECU explains that an overdraft occurs "when you do not have enough money in your account to cover a transaction." But FECU fails to explain what it means for the member to not have "enough money" in the account. In fact, FECU does charge overdraft fees even when there is enough money in the account to cover the transaction, which means that the opt-in disclosure agreement is not accurate.

51.     Many courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement constitutes a Regulation E violation.[13] By using inaccurate and/or ambiguous language to describe what

---

[13] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38, 1243-45 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds,"

-17-

Class Action Complaint
Case No.

constitutes an overdraft, FECU failed to provide the clear and easily understandable description of its overdraft services that Regulation E demands.

52.   Institutions that use an account's "available" balance to calculate overdrafts disclose it in a far more clear and specific manner than FECU. For example, Synovus Bank defines an overdraft as when there is not enough money in an account but it adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

53.   In addition, many financial institutions that use the actual balance to determine whether an account is in overdraft (meaning it looks strictly at the amount of funds in an account), as does, *e.g.*, MidFlorida Credit Union, use language that references the actual balance, not the available balance. (*See* https://www.midflorida.com/terms-

───────────

"available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

Class Action Complaint
Case No.

and-conditions/overdraft-agreement/ (last visited Aug. 20, 2021) (explaining that the language "[a]n overdraft occurs when you do not have enough money in your account to cover a transactions, but MIDFLORIDA pays it anyway" refers to the "[a]ctual balance").) Thus, if there is sufficient money in the account to cover a transaction—even if the money is subject to a hold for pending transactions—then the financial institution will not charge an overdraft fee.

54.     Because FECU failed to accurately, clearly, and in an easily understandable way disclose its overdraft policies and it failed to provide its members with a Regulation E complaint opt-in disclosure agreement, it therefore continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E. Further, on information and belief, FECU continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement.

55.     Further, FECU fails to appropriately opt members into its overdraft program pursuant to Regulation E's requirements. With regard to members who opted in by telephone, FECU did not even read to or otherwise provide the terms of its inaccurate opt-in disclosure agreement before asking for the member's consent to be bound by that agreement. Cabrillo also did not require its members to sign the opt-in disclosure agreement as Regulation E required, nor did it send members confirmation letters of that opt-in, which should have also contained information regarding the member's right to opt-out.

## V    FACTUAL ALLEGATIONS AGAINST DEFENDANT

56.     At all relevant times, FECU knew or should have known that in order to legally charge overdraft fees to members, it was required to first obtain affirmative consent from each member using a Regulation E compliant stand-alone opt-in disclosure agreement. Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language.

-19-

57.    At all relevant times, on information and belief, FECU used nearly identical opt-in disclosure agreements to opt-in Plaintiff and all putative class members.

58.    On July 3, 2021, Plaintiff made a $115.29 withdrawal from her account, leaving a positive balance of $537.31. Despite Plaintiff's positive balance, FECU charged Plaintiff a $27 overdraft fee as a result of the transaction. On the same day, Plaintiff made a $40 withdrawal from an ATM, leaving her with a positive account balance of $470.31. Again, despite the account's positive balance, FECU assessed Plaintiff with a $27 overdraft fee, leaving a balance of $443.31. Plaintiff then made a second $100 withdrawal later that day, leaving a positive balance in the account of $343.31. Again, Plaintiff was charged a $27 overdraft fee, still leaving a positive balance in the account of $316.31.

59.    On the next day, July 4, 2021, Plaintiff incurred a $20 charge at Starbucks, leaving a positive balance of $296.31. Again, despite the positive balance in her account, Plaintiff was assessed a $27 overdraft fee, leaving her account balance at $269.31. As a result of these transactions, Plaintiff was assessed over $100 in overdraft fees despite each of these transactions leaving a positive balance in the account when they were completed.

60.    Because FECU uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices, FECU has no legal basis on which to charge members overdraft fees on one-time debit card and ATM transactions, yet it does so anyway.

61.    At all relevant times, FECU knew it was using a specific "available" balance methodology to assess overdraft fees, and further knew or should have known that its methodology should be clearly and accurately described in a stand-alone document. FECU also knew or should have known that its opt-in disclosure agreement failed to provide an accurate, clear, and easily understandable definition of an overdraft.

62.    At all relevant times, FECU knew or should have known that Regulation E requires an accurate disclosure of FECU's overdraft services in a clear and conspicuous

manner, and that it prohibited the use of inconsistent terminology to describe such terms.

63.     At all relevant times, FECU misrepresented its overdraft program and promoted it inaccurately and/or in a misleading way.

64.     At all relevant times, FECU charged Plaintiff and the putative class members overdraft fees on one-time debit card and ATM transactions even though it did not first obtain members' affirmative consent using a legal opt-in disclosure agreement.

65.     Based on information and belief, FECU continues to opt members into its overdraft program using a non-compliant opt-in disclosure agreement, and then charges its members overdraft fees on certain one-time debit card and ATM transactions.

66.     Based on information and belief, FECU continues to charge existing members overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.[14]

## VI     PLAINTIFF'S HARM

67.     Plaintiff has held an account with FECU at all times relevant to the allegations and is believed to be opted into its overdraft program for his debit card and ATM transactions.

68.     As will be established using FECU's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions. On at least one occasion, Plaintiff was charged overdraft fees even when there was enough money in her account to cover her transaction.

69.     The extent of improper charges FECU assessed upon Plaintiff and other members will be determined in discovery using FECU's records.

70.     Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys. While Plaintiff understood that she was assessed fees, she did not

---

[14] Because FECU does not make information about how it opts in its members publicly available, the complaint may be amended following discovery to include additional grounds for Plaintiff's Regulation E violations.

-21-

understand the cause of those fees until 2021 because FECU was creating confusion among its members by describing different practices in agreements and other materials it was disseminating to members. This not only reasonably delayed discovery, but FECU's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop FECU.

## VII   CLASS ACTION ALLEGATIONS

71.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

72.     Plaintiff brings this case, and each of the respective causes of action, as a class action.

73.     The "Class" is composed of:

**The Regulation E Class**:

> All FECU members who have or have had accounts with FECU who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

**The UCL Class**:

> All FECU members who have or have had accounts with FECU who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning no more than four years preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

74.     Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

75.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

76.     **Numerosity** – The members of the Class ("Class Members") are so

-22-

numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of members harmed by these practices in circumstances with similar banks and credit unions that the Class is likely to include thousands of FECU members.

77.     Upon information and belief, FECU has databases, and/or other documentation, of its members' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been harmed by its practices and thus qualify as a Class Member. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

78.     **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether the FECU opt-in disclosure agreement violates Regulation E because it does not accurately, clearly, and in an easily understandable way describe FECU's overdraft program.
- Whether FECU violated Regulation E by assessing overdraft fees on one-time debit card and ATM transactions against Class Members.
- Whether FECU's conduct also violates the Nevada Deceptive Trade Practices Act.
- Whether FECU continues to violate Regulation E by opting in members and the public using its opt-in disclosure agreement and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on its opt-in disclosure agreement.

-23-

79. **Typicality** – Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding FECU's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement FECU used to opt-in Plaintiff is the same as the opt-in disclosure agreement FECU used to opt-in the other Class Members. Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions. Accordingly, Plaintiff will serve the interests of all Class Members.

80. **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

81. **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for FECU's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of

Class Action Complaint
Case No.

conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing FECU's violations of law to proceed without remedy and allowing FECU to retain the proceeds of its ill-gotten gains.

82.     Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

83.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, FECU's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

84.     This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or
- adjudication with respect to individual members of the Class would, as a

Class Action Complaint
Case No.

practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;
- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; and
- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

85.    FECU has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rules of Civil Procedure, Rule 23(b)(2). Moreover, on information and belief, Plaintiff alleges that FECU's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue into the future if an injunction is not entered.

**FIRST CAUSE OF ACTION**

**(Violation of Regulation E)**

86.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

87.    By charging overdraft fees on ATM and non-recurring debit card transactions, FECU violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*.,

the 'EFTA,'" 12 C.F.R. § 1005.1(b).

88.     Specifically, FECU's conduct violated Regulation E's "Opt In Rule." *See* 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account, nor can the financial institution influence a member's decision to opt-in.

89.     The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

90.     FECU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which

-27-

requires affirmative consent before a financial institution may assess overdraft fees against member accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. FECU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide members an accurate and non-ambiguous description of the overdraft program that members can understand in a "clear and readily understandable way." Further, the opt-in disclosure agreement fails to include all of the Regulation E required disclosures and includes other prohibited information.

91.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, FECU was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

92.     As the result of FECU's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

### (Violation of California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

93.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

94.     Defendant's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code § 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or

-28-

practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

95.     The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair competition in violation of the statutory scheme, or restitution to victims of the unfair competition.

96.     As further alleged herein, FECU's conduct violates the UCL's "unlawful" prong because that conduct violates public policy and/or the text of Regulation E. Defendant's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of FECU's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiff and Class Members arising from FECU's unlawful practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

97.     FECU's unlawful business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members, and the general public. FECU's conduct was substantially injurious to Plaintiff and the Class Members as they have been forced to pay millions of dollars in improper fees, collectively.

98.     Moreover, as described herein, FECU's conduct also violates the UCL's "unfairness" prong.

99.     As a direct and proximate result of FECU's UCL violations, Plaintiff and Class Members have been assessed improper and illegal overdraft fees and those funds removed from their account, and FECU has received, or will receive, income, profits, and

Class Action Complaint
Case No.

other benefits, which it would not have received if it had not engaged in the violations of section 17200 described in this Complaint.

100.   Further, absent injunctive relief forcing FECU to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting FECU from misrepresenting and omitting material information concerning its overdraft fee policy at issue in this action in the future and requiring FECU to immediately stop charging illegal overdraft fees unless and until it re-opts-in current members using a Regulation E complaint opt-in disclosure agreement, Plaintiff and other existing account holders, and the general public, will suffer from and be exposed to FECU's conduct violative of the UCL.

101.   Plaintiff requests that he be awarded all other relief as may be available by law, pursuant to California Business & Professions Code § 17203. To this end, Plaintiff seeks the return of improperly charged overdraft, NSF, or other fees within the statute of limitations period. Plaintiff further seeks a public injunction enjoining FECU from harming the general public by continuing to obtain new members' "consent" to assess overdraft fees by using an opt-in disclosure agreement and methods that violate Regulation E. Plaintiff also seeks to enjoin FECU from assessing further overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E-conforming opt-in disclosure agreement and opt-in methods. Further, Plaintiff seeks to enjoin FECU from assessing any further overdraft, NSF, or other fees on transactions pursuant to the available balance, which is in direct violation of its contract with its members

## VIII  PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a.    for an order certifying this action as a class action;

b.    for an order requiring FECU to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

c.    for statutory damages;

Class Action Complaint
Case No.

1          d.     for civil penalties;

2          e.     for an order enjoining the continued wrongful conduct alleged herein;

3          f.     for costs;

4          g.     for pre-judgment and post-judgment interest as provided by law;

5          h.     for attorneys' fees under the Electronic Fund Transfer Act, the

6   common fund doctrine, and all other applicable law; and

7          i.     for such other relief as the Court deems just and proper.

Dated: August 20, 2021          Respectfully Submitted,

                               */s/* David C. Wright

David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Attorneys for Plaintiff Jennifer Dupre Gutierrez
and the Putative Class

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: August 20, 2021          Respectfully Submitted,

                               */s/* David C. Wright

David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761

-31-

Telephone:   (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

Attorneys for Plaintiff Jennifer Dupre Gutierrez
and the Putative Class

***Pro Hac Vice* application to be submitted**

-32-

Class Action Complaint
Case No.